## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

| | | |
|---|---|---|
| SAVE LAKE SUPERIOR ASSOCIATION and SIERRA CLUB | ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | Case No. 07CV3557 PAMJRLE |
| NORTHSHORE MINING COMPANY | ) ) | PLAINTIFFS' COMPLAINT |
| Defendant. | ) ) | |

### I. STATEMENT OF THE CASE, JURISDICTION, AND VENUE

1.     This is a federal Clean Air Act citizen suit enforcement action brought by Plaintiffs Save Lake Superior Association and Sierra Club ("Plaintiffs") against Defendant Northshore Mining Company ("Northshore" or "Defendant") to address significant and ongoing violations of ambient fiber limits at Northshore's taconite production and disposal facilities ("Northshore's taconite facilities") in northeastern Minnesota. This complaint seeks declaratory and injunctive relief and the imposition of civil penalties (payable to the federal Treasury) under the federal Clean Air Act, 42 U.S.C. §§ 7401 through 7671q.

2.     This court has subject matter jurisdiction over the claims set forth in this complaint pursuant to 42 U.S.C. § 7604(a) (citizen suit provision of Clean Air Act) and 28 U.S.C. § 1331 (federal question statute). Jurisdiction also exists under 28 U.S.C. § 1331 because this action is brought to address Northshore's violations of its federally enforceable Clean Air Act Title V Operating Permit issued pursuant to 42 U.S.C. §§ 7661-61f, and Minnesota's EPA-approved Title V permit program. 66 Fed. Reg. 62967 (December 4, 2001). The relief

SCANNED

JUL 3 0 2007

U.S. DISTRICT COURT MPLS

requested is authorized pursuant to 28 U.S.C. §§ 2201 and 2202, and 42 U.S.C. §§ 7413 and 7604.

3.      Pursuant to 42 U.S.C. § 7604(c) and 28 U.S.C. §§ 1391(b) and (c), venue lies in the District of Minnesota because Northshore's taconite facilities are located in Lake County, Minnesota.

4.      To the extent required by 42 U.S.C. § 7604(b)(1)(A), on May 29, 2007, Plaintiffs notified in writing the Administrator of the EPA, the Minnesota Pollution Control Agency ("MPCA"), and the Defendant of the alleged violations set forth in this complaint and of Plaintiffs' intent to sue.  A true and accurate copy of Plaintiffs' notice letter is attached hereto as **Exhibit A**.

5.      On June 4, 2007, Plaintiffs provided a supplemental notice to the Administrator of the EPA, MPCA, and the Defendant of the alleged violations set forth in this complaint and of Plaintiffs' intent to sue.  A true and accurate copy of Plaintiffs' supplemental notice letter is attached hereto as **Exhibit B**.

6.      More than sixty days have passed since Plaintiffs' May 29, 2007 notice was served by U.S. Mail.  Defendant has never contacted Plaintiffs regarding their notice letter. Defendant has violated, and remains in violation of, its operating permit and the Clean Air Act.

7.      Neither the State of Minnesota nor EPA has commenced and is diligently prosecuting a court action to enforce the fiber limit and monitoring requirements that Plaintiffs allege Northshore has, and continues to, violate.

## II. PARTIES

8.      Save Lake Superior Association ("SLSA") is a citizen organization with the objective of protecting the Lake Superior environment, including the quality of its water and surrounding air.  SLSA brings this action on behalf of its adversely affected members.  The educational, scientific, aesthetic, and conservation interests of SLSA and its members have been, are being, and unless this Court grants the requested relief, will continue to be adversely affected by Northshore's ongoing violations of its Title V Permits and the Clean Air Act.

9.      The Sierra Club is a citizen organization that is dedicated to protecting natural resources, including clean air and water.  On behalf of its members, including its approximately 23,000 members in Minnesota's North Star Chapter, Sierra Club works to protect and enhance the quality of air in Minnesota, including the air on the north shore of Lake Superior that is impacted by the excessive fiber levels in the vicinity of Northshore's taconite facilities.  The Sierra Club brings this action on behalf of its adversely affected members.  The educational, scientific, aesthetic, and conservation interests of Sierra Club and its members have been, are being, and unless this Court grants the requested relief, will continue to be adversely affected by Northshore's ongoing violations of the Clean Air Act.

10.     Members of SLSA and Sierra Club reside on, work along, and/or regularly visit and use the resources of the north shore of Lake Superior, the airshed most immediately impacted by Northshore's violations of the Clean Air Act.  The aesthetic, recreational, environmental, spiritual, economic, and health-related interests of Plaintiffs' members have been injured by the excessive levels of fibers in the ambient air in the vicinity of Northshore's taconite facilities.  The interests of Plaintiffs' members that are directly injured by the excessive concentrations of fibers in the ambient air in the vicinity of Northshore's taconite facilities

3

include, but are not limited to: breathing air on the north shore of Lake Superior free from the elevated fiber levels in the vicinity of Northshore's taconite facilities, and protecting the natural ecology of the region from fiber-related impacts. The interests of Plaintiffs' members have been, and unless the relief requested herein is granted, will continue to be, adversely affected by Northshore's violations of the Clean Air Act.

11. Plaintiffs' members could bring this action in their individual capacity. None of the claims asserted or relief requested, however, requires that Plaintiffs' members bring such an action in their individual capacity.

12. Northshore Mining Company is a wholly-owned subsidiary of Cleveland-Cliffs, Inc. Cleveland Cliffs is the largest producer and merchant of iron ore pellets in North America. Cleveland Cliffs operates five iron ore mines located in Michigan, Minnesota, and Eastern Canada. Cleveland Cliffs is based in Cleveland, Ohio.

13. Northshore is authorized to do business in Minnesota. Northshore is the operator and owner of Northshore's taconite facilities. Northshore's taconite facilities produce taconite pellets and associated waste products. Northshore is the named permittee in MPCA Air Emission Permits dated February 24, 2004 (No. 07500003- 001) and July 14, 2006 (No. 07500003-004). Northshore has overall responsibility for ensuring that ambient fiber levels do not exceed permit limits, and Northshore has the authority to correct violations of air pollution permit limits at Northshore's taconite facilities.

4

## III.  STATEMENT OF FACTS

### Northshore's Taconite Facilities

14.     Northshore's taconite facilities are located in Lake County, Minnesota, near Silver Bay and Beaver Bay, Minnesota.

15.     Northshore's taconite mill is located in Silver Bay, Minnesota.  The mill, a 115 megawatt coal-fired power plant, open pit taconite mine in Babbit, associated 47-mile double track rail line and port on Lake Superior, and the town of Silver Bay itself, were originally constructed by Reserve Mining Company between 1951 and 1956.  The mill began full operation in 1956.  Tailings from the milling operation are disposed of in an area north of Beaver Bay.

16.     On September 30, 1994, Northshore purchased the original Reserve Mining Company taconite facilities in Lake County from Cyprus Northshore Mining Company, a subsidiary of Cyprus Minerals.  Northshore's taconite facilities currently produce approximately five million tons of taconite pellets per year.


### Prior Litigation Regarding Fibers

17.     In 1972, EPA, the states of Minnesota and Wisconsin, and citizen groups including SLSA, initiated legal proceedings to stop Reserve Mining Company from dumping taconite tailings into Lake Superior, and to stop the emission of asbestos-like fibers into the air. As a result of those proceedings and pertinent to this action, in 1975 the Eight Circuit Court of Appeals limited ambient levels of fibers beyond the property line of the Reserve taconite mill and disposal area to a level no greater "than that level ordinarily found in the ambient air of a control city such as St. Paul." *Reserve Mining Co. v. Environmental Protection Agency*, 514 F.2d 492, 539 (8th Cir. 1975).

18.     According to the Eight Circuit, the District Court found that fibers emitted into the air from Reserve Mining Company's taconite facilities were "substantially identical and in some instances identical to fibers of amosite asbestos." *Reserve Mining Co.,* 514 F.2d at 509-10 (8th Cir. 1976).

19.     After the decision of the Eighth Circuit in 1975, the MPCA issued a permit to Northshore's predecessor, Reserve Mining Company, that contained the "control city" standard. Reserve Mining Company unsuccessfully challenged the inclusion of the "control city" standard in MPCA's permit. *Reserve Mining v. Minnesota Pollution Control Agency,* 267 N.W. 2d 720, 725 (Minn. Supreme Court, 1978).

## Clean Air Act Title V Operating Permit Requirements

20.     The objective of the federal Clean Air Act is "to protect and enhance the quality of the nation's air resources so as to promote the public health and welfare and the productive capacity of its population." Section 101(b), 42 U.S.C. § 7401(b).

21.     Section 502(b) of the Clean Air Act, 42 U.S.C. § 7661a(b), required EPA to promulgate regulations establishing an operating permit program for stationary sources of air pollution. The regulations EPA promulgated, found at 40 C.F.R. Part 70, presently govern the establishment of federal operating permit programs.

22.     Pursuant to EPA's Part 70 regulations, the State of Minnesota created a Title V operating permit program to which EPA gave final approval on December 4, 2001. 66 Fed. Reg. 62967.

23.     Each Title V permit issued pursuant to this program must contain "enforceable emission limitations and standards" necessary to assure compliance with applicable requirements

of the Clean Air Act.  Furthermore, the Clean Air Act specifically prohibits any permittee from

violating any requirement of a Title V permit.  42 U.S.C. § 7661a(a).

24.     Section 304(a) of the Clean Air Act, 42 U.S.C § 7604(a), authorizes any person to

commence a civil action on his own behalf against any person "who is alleged to have violated

(if there is evidence that alleged violation has been repeated) or to be in violation of (A) an

emission standard or limitation under this chapter. . ."  The Clean Air Act's citizen suit provision

was passed by Congress in 1970 to afford citizens "very broad opportunities to participate in the

effort to prevent and abate air pollution."  1 Legislative History of the Clean Air Act

Amendments of 1970, Ser. No. 93-18, p. 138.

25.     The Clean Air Act at 42 U.S.C §§ 7604(f) defines "Emission standard or

limitation under this Act" to mean:

> (1) a schedule or timetable of compliance, emission limitation, standard of
> performance or emission standard . . . or (3) any condition or requirement under
> an applicable implementation plan relating to transportation control measures, air
> quality maintenance plans, vehicle inspection and maintenance programs or vapor
> recovery requirements, or any requirement under section 7411 or 7412 of this title
> (without regard to whether such requirement is expressed as an emission standard
> or otherwise); or (4) any other standard, limitation, or schedule established under
> any permit issued pursuant to subchapter V of this chapter or under any applicable
> State implementation plan approved by the Administrator, any permit term or
> condition, and any requirement to obtain a permit as a condition of operations
> which is in effect under this chapter or under an applicable implementation plan.

26.     A permit condition in a Title V permit issued by the MPCA is an enforceable

"emission standard or limitation" as defined by 42 U.S.C §7604(f)(1), (3), and (4), and therefore

violations of permit conditions are the proper subject of a citizen enforcement under 42 U.S.C. §

7604(a)(1).

7

**Northshore's Title V Operating Permits for Northshore's Taconite Facilities**

27.     On August 17, 1989, MPCA issued Northshore's predecessor Cyprus Northshore Mining Company an air pollution permit titled "Air Emission Facility Permit No. 27A-89-OT-1" (1989 permit). Cyprus did not appeal MPCA's issuance of the 1989 permit. When Northshore acquired the taconite facilities in 1994 it also acquired the obligation to comply with the 1989 permit.

28.     At page 19 of the 1989 permit the permittee was required to comply with the following ambient fiber limits "at or beyond the property line of the facility":

      a.    fibers in the ambient air shall be below a medically significant level;

      b.    the ambient air shall contain no more fibers than that level ordinarily found in the ambient air of a control city such as St. Paul;

      c.    the fibers in the ambient air shall be maintained below a level which is injurious to human health or welfare in violation of Minnesota Statute Section 116.06(3); and

      d.    such other standards which now or in the future may be applied to the Permittee's fiber emission.

29.     The 1989 permit defines the term "fibers" as "chrysotile and amphibole mineral particles with 3 to 1 or greater aspect ratios."

30.     On February 24, 2004, MPCA issued Air Emission Permit No. 07500003- 001 to Northshore ("2004 permit"). Northshore did not appeal MPCA's issuance of the 2004 permit. Consistent with the ruling of the Eighth Circuit in 1975, the ruling of the Minnesota Supreme Court in 1978, and the 1989 permit, the 2004 permit also contained both the "control city" and "medically significant level" limits on the concentration of fibers beyond the boundaries of Northshore's taconite facilities.

31.     According to the 2004 permit, Appendix B at p. 6, fibers in the ambient air

beyond Northshore's Milepost 7 Tailings Basin are not to exceed "control city" levels. As stated

at Appendix B in the permit:

> (7) Air Quality Limits
>
> The air quality standards at or beyond the property line of the disposal
> system to which the Regulated Party shall adhere, consistent with the
> determination of the Minnesota Supreme Court, are, among others, as
> follows:
>
> a.     Compliance with Minn. R. 7009.0010 to 7009.0080, 7011.0700 to
>        7011.0735 and 7011.0150;
>
> b.     Fibers in the ambient air shall be below a medically significant level;
>
> c.     The ambient air shall contain no more fibers than that level
>        ordinarily found in the ambient air of a control city such as St.
>        Paul;
>
> d.     The fibers in the ambient air shall be maintained below a level which is
>        injurious to human health or welfare in violation of Minn. Stat. § 116.06
>        (3); and
>
> e.     Such other standards which now or in the future may be applied to the
>        Regulated Party's fiber emission.

32.     Furthermore, according to the 2004 permit, Table A at p. A-4, ambient fiber

concentrations beyond the property line of Northshore's production facility in Silver Bay also are

not to exceed "control city" levels. As set forth in Table A of the 2004 permit:

> With respect to fibers, the air quality standards at or beyond the property
> line of the Silver Bay facility to which the Permittee shall adhere,
> consistent with the determination of the Minnesota Supreme Court, are:
>
> a.     fibers in the ambient air shall be below a medically significant level;
>
> b.     the ambient air shall contain no more fibers than that level ordinarily
>        found in the ambient air of a control city such as St. Paul;

      c.     the fibers in the ambient air shall be maintained below a level which is injurious to human health or welfare in violation of Minn. Stat. Sec. 116.06 (3); and

      d.     such other standards which now or in the future may be applied to the Permittee's fiber emissions.

33.     The term "fibers" is defined in the 2004 permit as "chrysotile and amphibole mineral particles with 3-to-1 or greater aspect ratios." Appendix B, paragraph (8), p. 8, and Table A, p. A-3.

34.     Northshore and its predecessors did not object to or otherwise appeal the "control city" and fiber monitoring requirements in the 1989 permit, the 2004 permit, or any other permit containing such requirements (collectively, "Permits").

35.     The ambient fiber limit and fiber monitoring requirements contained in the 1989 and 2004 permits are "emission standards or limitations" within the meaning of 42 U.S.C §7604(f).

## Monitoring of Ambient Fiber Levels In St. Paul

36.     The ambient level of fibers "in a control city such as St. Paul" was established by ambient fiber monitoring performed by MPCA in St. Paul between March 2006 and March 2007.

37.     MPCA conducted its fiber monitoring in St. Paul to determine whether fiber levels adjacent to Northshore's taconite facilities were exceeding fiber levels ordinarily found in St. Paul.

38.     **Exhibit C** shows the level of amphibole and chrysotile asbestos fibers per cubic meter measured by MPCA that are "ordinarily found in the ambient air of a control city such as

St. Paul." According to the results of MPCA's fiber monitoring between March 2006 and March 2007, the annual geometric mean of ambient fibers in St. Paul is 1,146 fibers per cubic meter.

### Monitoring of Ambient Fiber Levels Near Northshore's Taconite Facilities

39.     Pursuant to Northshore's Permits, Northshore is required to monitor and report the levels of fibers at areas adjacent to its taconite facilities. Two ambient fiber monitors are used to determine the concentration of fibers near Northshore's taconite facilities, and thus Northshore's compliance with St. Paul's background fiber levels. Monitoring station F1 is located approximately two miles southeast of Northshore's Milepost 7 Tailings Basin, and monitoring station F7 is located in the town of Silver Bay, immediately northwest of Northshore's production facility. See **Exhibit D**. The two fiber monitors at these monitoring stations collect ambient air samples continuously for three-day periods, are off for approximately eighteen days, and then collect another three-day sample, for a continuous, 21-day cycle.

40.     As shown in Table 1 below, for the last five years Northshore has exceeded St. Paul's 1,146 fibers per cubic meter annual geometric mean at monitoring station F1.

Table 1: <u>Annual Geometric Means, Fibers/M$^3$, Monitoring Station F1</u>

| Calendar Year | F1 Fibers/M$^3$ |
|---|---|
|  |  |
| 2006 | 2,561 |
| 2005 | 5,747 |
| 2004 | 3,273 |
| 2003 | 4,204 |
| 2002 | 1,784 |

41.     At monitoring station F1, Northshore exceeded St. Paul's 1,146 fibers per cubic meter average in 61 out of the 79 sample periods over the last five years. Numerous monitoring results at monitoring station F1 showed fiber levels that were ten times greater than levels found in St. Paul. One monitoring result from November of 2005 reported over 140,000 fibers per cubic meter at monitoring station F1, a fiber level more than 100 times greater than that ordinarily found in St. Paul. Data from monitoring station F1 indicates that for every calendar year from 2002 through 2006, the annual geometric mean of fibers per cubic meter exceeded St. Paul's annual geometric mean of 1,146 fibers per cubic meter. As shown in Table 1 above, the annual geometric means of fiber levels at monitoring station F1 were often two to three times in excess of St. Paul levels.

12

42.    As shown in Table 2 below, for the last five years Northshore also has exceeded St. Paul's 1,146 fibers per cubic meter annual geometric mean at monitoring station F7.

**Table 2: Annual Geometric Means, Fibers/M$^3$, Monitoring Station F7**

| Calendar Year | F7, Fibers/M$^3$ |
|---|---|
|  |  |
| 2006 | 3,399 |
| 2005 | 5,908 |
| 2004 | 4,814 |
| 2003 | 3,677 |
| 2002 | 2,274 |

43.    At monitoring station F7, Northshore exceeded St. Paul's 1,146 fibers per cubic meter average for 70 out of the 86 samples collected over the last five years. As with monitoring station F1, many of the data points from monitoring station F7 showed fiber levels that were ten or more times greater than levels found in St. Paul. Similar to the results from monitoring station F1, every calendar year from 2002 through 2006 the annual geometric mean of fiber monitoring results from monitoring station F7 exceeded St. Paul's annual geometric mean of 1,146 fibers per cubic meter.

44.    As shown in Table 2 above, the annual geometric means of fiber levels at monitoring station F7 were often two to three times in excess of St. Paul levels.

45.     Under the "control city" standard set forth in Northshore's Permits, every day that individual fiber monitoring results at monitoring station F1 and/or monitoring station F7 show fiber levels in excess of the annual geometric mean of fiber levels in St. Paul, such day represents a separate violation of Northshore's Permits and the Clean Air Act.

46.     Data collected by monitoring stations F1 and F7 show 85 such daily exceedance violations. See **Exhibit E.**

47.     Every day within any calendar year in which the annual geometric mean of fiber monitoring results at monitoring station F1 and/or monitoring station F7 show fiber levels in excess of the geometric mean of fiber levels in St. Paul represents a separate violation of Northshore's Permits and the Clean Air Act.

48.     As seen in Tables 1 and 2 above, the annual geometric means of fiber monitoring results from both monitoring station F1 and F7 exceed the annual geometric mean of fiber levels in St. Paul for every year between 2002 and 2006.

49.     The "control city" standard that Northshore is violating is a stand-alone requirement of the company's permits. Demonstrating a violation of the "control city" standard requires only the comparison of collected data points from monitoring stations with the data points from a control city. Plaintiffs alleging a violation of the "control city" standard need neither allege nor demonstrate that fiber levels are above levels that are injurious to human health or welfare in violation of Minn. Stat. § 116.06 (3), above a "medically significant level, or above any other standard which now or in the future may be applied to the Permittee's fiber emissions. Likewise, enforcement of the "control city" standard can not be delayed or undermined by any effort to establish a "medically significant level" or any other fiber limit applicable to Northshore. Consequently, it is not a valid defense to an action to enforce the

14

"control city" standard that fiber levels are below any "medically significant level" or any other standard.

50.     In addition to the daily exceedance violations, every 21-day period for which Northshore failed to collect ambient air samples on a 21-day cycle constitutes a violation of its Permits and of the Clean Air Act.

51.     Data collected by monitoring stations F1 and F7 demonstrate 23 separate failures by Northshore to collect ambient air samples at either monitoring station F1 or monitoring station F7.  On two occasions, Northshore failed to collect ambient air samples from either of its two monitoring stations, for a total of 21 data collection cycles for which data is missing.  See **Exhibit E**.

## IV. CAUSES OF ACTION

52.     Plaintiffs incorporate by reference and reallege the allegations contained in paragraphs 1 through 51 for all causes of action stated below.

### FIRST CAUSE OF ACTION

### Ambient Fiber Levels Exceed the Control City Standard

53.     According to Northshore's Permits, "the ambient air [at the property boundary of the Northshore site] shall contain no more fibers than that level ordinarily found in the ambient air of a control city such as St. Paul."

54.     The "control city" standard applicable to Northshore's taconite facilities has applied at all times between June, 2002 and the date of this complaint.

15

55.     The "control city" standard is an "emission standard or limitation" within the meaning of 42 U.S.C §7604(f).

56.     Between June 1, 2002 and the date of this complaint, Northshore has repeatedly violated its Permits by allowing ambient fiber levels to exceed the "control city" standard.

57.     Northshore continues to violate the "control city" standard set forth in its Permits, and the Clean Air Act, by allowing ambient fiber levels to exceed the "control city" standard.

58.     By virtue of its violations of its Permits, Northshore is also in violation of the Clean Air Act.


## SECOND CAUSE OF ACTION

59.     Pursuant to Northshore's Permits, Northshore is required to perform fiber monitoring at monitor stations F1 and F7 on a 21-day schedule.

60.     Northshore has failed consistently to perform fiber monitoring on a 21-day schedule.

61.     The fiber monitoring requirement is an "emission standard or limitation" within the meaning of 42 U.S.C §7604(f).

62.     All monitoring periods in which Northshore failed to collect ambient fiber monitoring data constitute violations of Northshore's permits and the Clean Air Act. All monitoring periods in which Northshore failed to provide ambient fiber monitoring data constitute violations of the "control city" standard.

## V. RELIEF REQUESTED

WHEREFORE, Plaintiffs respectfully request that this Court grant the following relief to correct Defendant's significant and ongoing violations of law:

A.      DECLARE that Defendant has violated and continues to violate its Permits and the Clean Air Act by allowing ambient fiber levels to exceed the "control city" standard;

B.      ISSUE A PERMANENT INJUNCTION enjoining Defendant:

1.      To take all necessary measures to achieve full, immediate, and continuing compliance with the "control city" standard;

2.      To monitor fiber levels on a continuous basis at locations where wind patterns and geography indicate that fiber concentrations will be the highest;

3.      To comply consistently with the 21-day fiber monitoring requirement at monitoring stations F1 and F7.

C.      ORDER Defendant to pay to the federal Treasury a civil penalty of $32,500 per day for each of Defendant's violations of the Clean Air Act, as provided for by law. 40 U.S.C. § 7413(b); 28 U.S.C. § 2461, as amended by 31 U.S.C. § 3701; 40 C.F.R. § 19.2. These violations include each daily exceedance violation, each annual geometric mean exceedance, and each failure to collect ambient air sampling data. The penalties should be directed to finance EPA air compliance and enforcement activities, as provided for by 42 U.S.C. § 7604(a) and 42 U.S.C. § 7604(g)(1);

D.      ORDER Defendant to pay up to $100,000 for beneficial mitigation projects, as provided for by 42 U.S.C. § 7604(g)(2), consistent with the purposes of the Clean Air Act;

E.      ORDER Defendant to pay Plaintiffs their costs of litigation, including but not

limited to reasonable attorney and expert witness fees, as authorized in Section 304 of the Clean

Air Act, 42 U.S.C. § 7604(d); and

F.      GRANT such other relief as the Court deems necessary and proper.

DATED this ___30th___ day of July, 2007.

SAVE LAKE SUPERIOR ASSOCIATION and
SIERRA CLUB

Kristen M. Gast, MN # 0346007
kgast@faegre.com
Faegre & Benson
2200 Wells Fargo Center
90 South Seventh Street
Minneapolis, MN 55402-3901
Voice: 612-766-7953
Fax: 612-766-1600

Reed Zars, WY Bar No. 6-3224
rzars@lariat.org
Attorney at Law
910 Kearney Street
Laramie, WY 82070
307-745-7979
307-745-7999 (fax)
*Pro Hac Vice Motion Pending*

Attorneys for Plaintiffs Save Lake Superior
Association and Sierra Club.

fb.us.2205047.01

732683



FAEGRE
&
BENSON
LLP

UNITED STATES | ENGLAND | GERMANY | CHINA

KRISTEN M. GAST
kgast@faegre.com
(612) 766-7953

July 30, 2007

## HAND DELIVERED

RECEIVED
07 JUL 30  PM 12:42
CLERK U.S. DIST. COURT
MINNEAPOLIS, MN

Clerk
United States District Court
202 U.S. Courthouse
300 South Fourth Street
Minneapolis, MN  55415

  Re:  **Save Lake Superior Association and Sierra Club v. Northshore
       Mining Company**, Civil No. _____  (D. Minn.)

Dear Clerk:

Enclosed for filing in the above-captioned matter please find the following documents:

  (1)   Civil Cover Sheet.

  (2)   Summons.

  (3)   Complaint with Exhibits A-E.

  (4)   Civil Disclosure Certificate.

  (5)   Motion For Admission Pro Hac Vice.

A check in the amount of $450.00 is enclosed for the fees as follows:

  • $350.00 Filing Fee
  • $100.00 Pro Hac Vice Fee

Affidavits of Service will be filed when service is completed.

Clerk, U.S. District Court
July 30, 2007
Page 2

   By copy of this letter we are enclosing a courtesy copy of these documents for the judge assigned to the case.

        Sincerely,

        Kristen M. Gast

/saj
Enclosures
fb.us.2205444.01